* * * * * * * * * * *
The Full Commission reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Decision and Order, except for minor modifications. Accordingly, the Full Commission affirms with the Decision and Order of Deputy Commissioner Taylor with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The parties stipulated to the following undisputed facts:
 a) The plaintiff was incarcerated at Morrison Youth Institution, North Carolina Department of Correction, at the time of the incident complained of in this action; *Page 3 
 b) Harry Davis, Ronald Campbell, and Gary Miller were employees of the defendant on April 20, 2000; and
 c) On April 20, 2000, while the plaintiff was incarcerated at Morrison Correctional Institution, the plaintiff was assaulted by inmates, and sustained bodily injury that required medical attention.
 * * * * * * * * * * * EXHIBITS
Stipulated Documents:
1. Duties and Responsibilities of Correctional Officer, 5 NCAC 2F.1301, .1302, .1303, .1304;
2. Responsibilities of Area Administrators and Institutional Heads, 5 NCAC 2F.1601, .1602;
3. Department of Correction Medical Records for the plaintiff;
4. Wake Medical Center medical records; 5. Trust Fund Report for the plaintiff; and 6. April 20, 2000 Shift Narrative.
Plaintiff's Exhibits:
1. Defendant's Response to request No. 3 of Plaintiff's Second Request for Production of Documents: All incident reports regarding inmate on inmate assaults at Morrison Correctional Institution from September 1999 to May 2000;
2. Summary of Defendant's Response to request No. 3 of Plaintiff's Request for Production of Documents; *Page 4 
3. 2002 North Carolina Department of Correction Internal Investigation of the April 20, 2000 assault on the plaintiff; 4. Disciplinary package for Aaron Coppedge; and 5. Disciplinary package for Jeffrey Bledsoe.
Defendant's Exhibits:
1. Statement of the plaintiff taken by Officer Cooper dated April 23, 2000;
2. Tort Claim Affidavit; and
3. Map. * * * * * * * * * * * Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: FINDINGS OF FACT
1. The plaintiff was processed into the prison system at Polk Youth Institution on March 12, 2000. In April 2000, he was assigned to Morrison Youth Institution. In April 2000, Morrison Youth Institution housed over 400 inmates with sentences ranging from six months to life in prison. The plaintiff was housed in a prison dormitory known as "Johnson Building, Chance Quad, C Dorm," which held 30 inmates. Three other dormitories were in the building.
2. Officer Campbell was assigned to supervise the plaintiff's dormitory and dormitory D. On April 20, 2000, Officer Campbell was a new employee and was "uncertified," meaning he had not graduated from the Correctional Officer Basic Training Course. Officer Campbell was responsible for the control, custody, and welfare of inmates in his assigned area. He was required to keep each assigned inmate under visual observation at all times and, when conditions made this *Page 5 
impossible, he was to patrol the assigned area continuously pursuant to 5 NCAC 2F.1301, 1302, 1303, and 1304.
3. Sergeant Davis was the Officer-In-Charge on April 20, 2000. He had a managerial role and was responsible for his assigned portion of the Institution during the eight-hour shift. On April 20, 2000, the Johnson Building was under his supervision.
4. The standard of care and operating procedures require that, when an officer observes conflict between inmates, a report shall be made immediately to the Officer-In-Charge and recorded in the log. According to Sergeant Davis, when an inmate reports a threat, the correctional officer is to: (1) take the inmate to the location to identify the threatening inmate; (2) keep the inmate in the officer's control; (3) notify master control; and (4) get a sergeant to respond to the situation.
5. Gary Miller was superintendent of the Institution, and oversees the management of the Institution pursuant to 5 NCAC 2F.1601.
6. April 20, 2000, was a "pay day" at the Institution, when inmates received funds requested the day before from their prison trust accounts. On payday, an officer comes into the dormitory, calls out the inmate's name, and gives him the requested money. This is done in the open, so whoever is present knows which inmates have money.
7. The plaintiff had requested $9.50 from his trust fund account because he needed money to buy stamps.
8. Pay day is known by the staff and inmates to be a dangerous day because inmates are likely to rob other inmates. On April 20, 2000, during second shift muster, Capt. Jacobs advised everyone "to be especially on the alert and patrol their assigned areas due to it being *Page 6 
payday," and because second shift would be short staffed. Over $6,000.00 was handed out on April 20, 2000.
9. Most inmates had school or job assignments outside the dormitory during the day. On April 20, 2000, the plaintiff and five or six other inmates were assigned to stay in the dormitory and clean Dormitory C during the day.
10. After the payday money was distributed, the plaintiff and another inmate had an argument over the plaintiff's money. The other inmate wanted plaintiff's money. He had transferred in that morning, and the plaintiff did not know him. Officer Campbell was in Dorm C and observed the incident. The argument died down, and the inmates resumed cleaning the dormitory.
11. Later, Officer Campbell pulled plaintiff out of the dormitory saying he "had a job" for plaintiff. Once separated from the other inmates, the plaintiff told Officer Campbell that someone was trying to rob him. Plaintiff said, "they know I have money, and they are going to try to beat me up." Officer Campbell asked the plaintiff which inmates were going to assault him. Plaintiff said he did not know their names. Officer Campbell told the plaintiff there was nothing he could do, and instructed the plaintiff to go back to the dormitory and watch his back.
12. Officer Campbell did not alert the Officer-In-Charge of the situation or make any log entry. Officer Campbell also failed to patrol Dormitory C after he returned the plaintiff to there. Officer Campbell did not testify at the hearing before the Deputy Commissioner.
13. When the plaintiff went back to the dormitory he positioned himself in the middle of the dormitory, which he considered to be the safest place. About 30 to 45 minutes later, several inmates ganged up on the plaintiff saying they knew he had money and they wanted it. The plaintiff turned to walk out of the dorm when he got hit from behind and was then kicked by *Page 7 
an inmate. The plaintiff tried to get out of the dormitory. He got to the door when one of the inmates pulled him back in and beat him up by kicking him in the face. Another inmate hit the plaintiff in the nose with a combination lock. The plaintiff was knocked out. When he regained consciousness, he crawled to the door and yelled for help. 14. Officer Round, who was supervising A and B dormitories, was the first officer to arrive. She saw the plaintiff with a bloody face as he held the doorframe, and testified that he slid down the doorframe. She yelled for Officer Campbell, who came out of Dormitory D, saw the plaintiff, and called the sergeant. Officer Campbell had not patrolled Dormitory C since he sent the plaintiff back to the dormitory.
15. The plaintiff was sent to McCain Prison Hospital, where x-rays revealed a broken nose. He also sustained two black eyes, cuts and bruises on his face, chest, and back, and received stitches. The plaintiff testified the he has never experienced a beating like the one he received on April 20, 2000.
16. Inmates Jeffrey Bledsoe and Aaron Coppedge, Jr., were found guilty of the assault.
17. The defendant contends that Officer Campbell did not call the plaintiff out of the dormitory to talk to him. The witness statement of inmate Kenneth Deese states as follows:
 Coppedge was talking to him about some money. The white boy come back. Coppedge talking to him some more. Then Coppedge hit him. He try to get out of the dorm. They him some more. He got to the door. Bledsoe pull him back in the dorm. And they kick him in the face.
The Full Commission finds that Officer Campbell called plaintiff out of the dormitory, that plaintiff alerted Officer Campbell to his fear that he would be assaulted, and that Officer Campbell sent plaintiff back into the dorm, and then failed to patrol the dormitory. *Page 8 
18. The defendant also contends that the plaintiff had become indebted to other inmates and was therefore contributorily negligent for his injuries. The defendant's claim that plaintiff was contributorily negligent is based in total on the statement of inmate Bledsoe. Inmate Bledsoe was found guilty of beating plaintiff by a prison Disciplinary Hearing Officer. In the statement, Bledsoe denied he was involved in the assault on plaintiff and claimed he "left out and went outside fast." The Full Commission finds Bledsoe's statement to be inherently unreliable, as did Sergeant Davis, and, therefore, rejects defendant's defense of contributory negligence.
19. On May 18, 2000, as a direct and proximate result of the April 20, 2000 assault, plaintiff underwent septoplasty with submucosal resection of inferior turbinates and closed reduction of a left depressed nasal fracture at Wake Medical Center. The surgeon found a "grossly obstructed nose with mid posterior deflection of the septum to the right and an anterior and posterior cartilaginous and bony deviation to the left with essentially little to no adequate nasal airway." Although the operation was to be an outpatient surgery, the plaintiff reacted poorly and was kept overnight. The defendant paid for all of the plaintiff's medical treatment and surgery relating to the assault while he was in the defendant's custody.
20. The plaintiff testified that he continues to suffer headaches, nosebleeds, stuffiness, runniness, and discomfort sleeping. He stated that the injury affects him on a daily basis. 21. The plaintiff has treated with Dr. Brian Gibson, who is board-certified in ear, nose, and throat medicine. Dr. Gibson testified at deposition that the surgery plaintiff had at Wake Med had resulted in some improvement for the plaintiff, but that the plaintiff continues to have residual curvature of the septum. This curvature partially obstructed the left side of the nose. Dr. Gibson attributed the greater part of the plaintiff's difficulty in breathing to this obstruction. In addition, *Page 9 
Dr. Gibson testified that the obstruction increased the plaintiff's susceptibility to sinus infection and snoring. 22. Dr. Gibson further testified that the plaintiff's condition may require additional surgery because the plaintiff "may find that if he develops additional congestion problems in his nose, that his combined congestive and anatomic problems lead to a greater degree of obstruction — or a greater perception of obstruction." Dr. Gibson was of the opinion that there is a greater than fifty percent probability that additional surgery would improve the plaintiff's medical condition. Dr. Gibson stated that the present cost of such surgery would be approximately $4,000.00, and was of the opinion that the plaintiff could expect about $5,000.00 for medical care related to his nose over the course of his lifetime.
23. As a result of the negligence of Officer Campbell, Sergeant Davis, and Superintendent Miller, the plaintiff suffered an assault which caused injury to the plaintiff. The plaintiff's injury required surgery, resulting in pain and suffering, and will likely require further medical care, including additional surgery. Based upon the totality of the evidence of record, including the testimony of Dr. Gibson, the Full Commission finds that the plaintiff will likely require further surgery and subsequent care that would reasonably approximate $9,000.00 in damages. In addition, the Full Commission finds that plaintiff is entitled to reasonable damages for his pain and suffering in the amount of $9,000.00. Thus, the Full Commission finds that the plaintiff is entitled to a total of $18,000.00 in reasonable damages under the Tort Claims Act.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW *Page 10 
1. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties. Bolkir v.N.C. State University, 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988). The general rule is that a prison official is liable when he knows of, or in the exercise of reasonable care, should anticipate danger to the prisoner, and with such knowledge or anticipation fails to take the proper precautions to safeguard his prisoners. Taylor v. North CarolinaDepartment of Correction, 88 N.C.App. 446, 451, 363 S.E.2d 868, 871
(1988) (quoting Williams v. Adams, 288 N.C. 501, 504, 219 S.E.2d 198,200) (1975). It is equally established law that the NCDOC is "not an insurer of the safety of every inmate and will not be found liable for negligence every time one inmate assaults another . . .?Taylor, 88 N.C.App. at 452-53, 363 S.E.2d at 871.
2. The named employees of defendant in this matter could reasonably have foreseen that the plaintiff was in danger. Officer Campbell, as the officer in charge of Dorms C and D, had a duty to protect the plaintiff from foreseeable assaults. Officer Campbell's actions in sending the plaintiff back into the dormitory after the plaintiff had reported a threat to him constituted a breach of that duty. And failing to patrol the dormitory constituted a further breach of that duty. In addition, Sergeant Davis had a duty to protect plaintiff against foreseeable harm. Sergeant Davis' failure to ensure that Dormitory C was adequately patrolled on payday breached that duty. Further, Superintendent Gary Miller had a duty to protect plaintiff against foreseeable harm. Superintendent Miller's failure to adequately staff the dormitory was a breach of that duty. See Taylor.
3. As a result of the negligence of Officer Campbell, Sergeant Davis, and Superintendent Miller, the plaintiff suffered an assault which caused injury to the plaintiff. The plaintiff's injury required surgery, resulting in pain and suffering, and will likely require further *Page 11 
medical care, including additional surgery. Based upon the totality of the evidence of record, including the testimony of Dr. Gibson, the Full Commission finds that the plaintiff will likely require further surgery and subsequent care that would reasonably approximate $9,000.00 in damages. In addition, the Full Commission finds that plaintiff is entitled to reasonable damages for his pain and suffering in the amount of $9,000.00. Thus, the Full Commission finds that the plaintiff is entitled to a total of $18,000.00 in reasonable damages under the Tort Claims Act. N.C. Gen. Stat. § 143-291. * * * * * * * * * * * Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following: ORDER
1. The defendant shall pay to the plaintiff the sum of $18,000.00 in reasonable damages pursuant to the Tort Claims Act.
2. The defendant shall pay the costs of this matter.
This 5th day of December 2007.
 S/______________________
 CHRISTOPHER SCOTT
 COMMISSIONER
CONCURRING:
S/______________________ DANNY LEE McDONALD COMMISSIONER *Page 12 
S/______________________ PAMELA T. YOUNG COMMISSIONER *Page 1